UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RIZWAN MAHMOOD,<br><br>                              Plaintiff,<br><br>v.<br><br>NATIONAL CREDIT<br>SYSTEMS, INC.,<br><br>                              Defendant. | Case No.:  24-cv-203-WQH-KSC<br><br>**ORDER** |

HAYES, Judge:

The matters before the Court are (1) the Motion for Summary Judgment (ECF No. 19) filed by Defendant National Credit Systems, Inc. ("Defendant") and (2) the Court's Order to Show Cause regarding subject matter jurisdiction (ECF No. 28).

# I.    PROCEDURAL BACKGROUND

On January 31, 2024, Plaintiff Rizwan Mahmood ("Plaintiff") initiated this action by filing a Complaint against Defendant, asserting claims for violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.* ("FDCPA"), and the California Consumer Credit Reporting Agencies Act ("CCRAA"), Cal. Civ. Code § 1785.1 *et seq.* (ECF No. 1, Compl.) The Complaint alleged that the Court had subject matter jurisdiction over this action pursuant to federal question jurisdiction and supplemental jurisdiction. *Id.* ¶ 9 (citing 28 U.S.C. §§ 1331, 1367; 15 U.S.C. § 1692k). Plaintiff seeks actual damages, statutory damages, punitive damages, attorneys' fees and costs, equitable and injunctive relief, and other such relief as the Court deems just and proper. *Id.* at 10.

On February 28, 2024, Defendant filed an Answer to the Complaint. (ECF No. 5.)

On January 31, 2025, Defendant filed the pending Motion for Summary Judgment, contending that: (1) the FDCPA is inapplicable to the conduct about which Plaintiff complains, (2) Plaintiff's FDCPA claim is barred by the statute of limitations, (3) Defendant is entitled to summary judgment on its bona fide error affirmative defense to Plaintiff's FDCPA and CCRAA claims, (4) Plaintiff cannot demonstrate that Defendant willfully violated the CCRAA, and (5) Plaintiff has not incurred actual damages and thus lacks Article III standing or, in the alternative, Plaintiff cannot demonstrate that he has incurred economic damages. (ECF No. 19.) On February 24, 2025, Plaintiff filed a Response in Opposition to Defendant's Motion for Summary Judgment. (ECF No. 22.) On February 26, 2025, Plaintiff filed a Response to Defendant's Separate Statement of Undisputed Material facts. (ECF No. 24.) On March 5, 2025, Defendant filed a Reply. (ECF No. 27.)

On April 15, 2025, the Court issued an Order to Show Cause, instructing the parties to file responses addressing "whether the Court may properly exercise subject matter jurisdiction over this action" in light of Plaintiff's concession that Defendant is entitled to summary judgment on Plaintiff's federal FDCPA claim, leaving only Plaintiff's state-law CCRAA claim remaining. (ECF No. 28 at 1–2.)

On April 21, 2025, the parties filed their respective responses to the Order to Show Cause. (ECF Nos. 30, 31.) On April 28, 2025, the parties filed replies to each other's responses. (ECF Nos. 32, 33.)

On July 11, 2025, the Court heard oral argument on the Motion for Summary Judgment and the parties' responses to the Order to Show Cause.

## II. FACTS

### A. Evidentiary Objections

#### 1. Plaintiff's Federal Rule of Civil Procedure 37(c)(1) Objections

As a preliminary matter, the Court addresses Plaintiff's objections that, pursuant to Federal Rule of Civil Procedure 37(c)(1), portions of Defendant's evidence should be

excluded due to Defendant's alleged failure to comply with its discovery obligations. (ECF No. 22-18.) In particular, Plaintiff objects to Defendant's "reference to any purported written procedure in support of its Bona Fide Error Affirmative Defense" on the grounds that Defendant "failed to produce any written procedures during the course of written discovery and also failed to attach any such procedures to its Motion [for Summary Judgment]." (ECF No. 22-18 at 2). Plaintiff points out that, in response to Plaintiff's request that Defendant produce "any DOCUMENT concerning every procedure that Defendant utilized regarding Plaintiff's dispute(s)," Defendant objected on grounds that the request was burdensome, lacked specificity, was irrelevant, and called for the disclosure of confidential information and ultimately failed to produce any corresponding documents. (ECF No. 22-8 at 7.)

Plaintiff also objects to Defendant's "reference to any conduct of its employee, Mike Cook," on the grounds that Defendant "failed to identify Mr. Cook in its Initial Disclosures and in its written responses." (ECF No. 22-18 at 2.) Plaintiff further contends that "any reference to Cook or these procedures is inadmissible hearsay." *Id.* Plaintiff contends that Defendant should be prohibited from relying on this evidence at summary judgment and at trial.

Pursuant to Federal Rule of Civil Procedure 37(c)(1),

If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:

(A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure;

(B) may inform the jury of the party's failure; and

(C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi).

Fed. R. Civ. P. 37(c)(1). District courts have "wide latitude" to exercise discretion in applying Rule 37(c)(1). *See Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001). "Implicit in Rule 37(c)(1) is that the burden is on the party facing sanctions to prove harmlessness." *Id.* at 1107. In determining whether substantial justification or harmlessness exist, courts consider several factors, "including (1) prejudice or surprise to the party against whom the evidence is offered; (2) the ability of that party to cure the prejudice; (3) the likelihood of disruption of trial; and (4) bad faith or willfulness in not timely disclosing the evidence." *Liberty Ins. Corp. v. Brodeur*, 41 F.4th 1185, 1192 (9th Cir. 2022) (quoting *Silvagni v. Wal-Mart Stores, Inc.*, 320 F.R.D. 237, 242 (D. Nev. 2017)).

### a.    Disclosure of Defendant's Procedures

Defendant contends that, "[c]ontrary to Plaintiff's unfounded assertions, [Defendant] has not avoided any discovery obligation to produce written procedures or attempted to rely on evidence of procedures that have not been produced, because the only written procedures regarding use of the drop-down menus in WinDebt [Defendant's software program] are the screenshots of the menus which were produced." (ECF No. 27 at 3.) Defendant explains that the "procedures" it relies upon to support its bona fide error defense are not "written," but rather are "part of the workflow steps programmed into the software." *Id.* Defendant also points out that "Plaintiff did not file any motion to compel or invoke the Court's discovery dispute process regarding [Defendant's] discovery objections." *Id.* at 3 n.2. Defendant contends that Plaintiff cites no authority to support that it may not offer testimony from its corporate representative regarding these unwritten procedures. *See id.* at 4.

The Court agrees with Defendant and overrules Plaintiff's objection. Defendant is not relying on previously undisclosed documentary or written evidence discussing its procedures. Instead, Defendant is relying on the declaration of its corporate representative and Vice President of Operations, Ron Sapp ("Sapp"), to discuss the workflow actions in

WinDebt, Defendant's software program. Defendant represents that a description of these workflow actions is not otherwise contained in written form.

Additionally, the factors commonly considered by courts in evaluating substantial justification and harmlessness demonstrate that exclusion of Defendant's unwritten procedures is unwarranted. *See Liberty Ins. Corp.*, 41 F.4th at 1192. In terms of prejudice and surprise to Plaintiff from Defendant's reliance on these unwritten procedures, the Court notes that Sapp appears to have referenced the WinDebt work actions—albeit not extensively—in portions of his deposition testimony. (*See* ECF No. 22-10 at 15 (referencing "[t]he work actions that were created to allow us to report different information for separate individuals associated with one particular debt" and clarifying that a "work action" is "a policy, procedure, and the steps taken").) There is also no risk of "disruption of trial" from permitting Defendant to rely on its unwritten procedures because Plaintiff has adequate time to prepare to challenge Defendant's procedures prior to trial; indeed, Plaintiff challenges this issue on the merits in his Opposition brief by contending that the procedures are unreasonable. Finally, there is no evidence that Defendant acted willfully or in bad faith by failing to disclose the unwritten procedures prior to now. As noted above, Defendant represents that it had no written procedures documenting the WinDebt workflow or work actions that it could provide to Plaintiff in a documentary form, which supports that Defendant was not acting in bad faith by failing to disclose these procedures in response to Plaintiff's request for production. Accordingly, in light of the Ninth Circuit's observation that "caselaw interpreting Rule 37(c)(1) makes clear that exclusion of evidence under Rule 37(c)(1) is not appropriate if the 'failure to disclose the required information is substantially justified or harmless,'" the Court declines to exclude Defendant's evidence of its unwritten procedures pursuant to Rule 37(c)(1). *Liberty Ins. Corp.*, 41 F.4th at 1191–92 (quoting *Yeti by Molly Ltd.*, 259 F.3d at 1106).[1]

---

[1] The Court notes, however, that Sapp's declaration makes several references to Defendant's "written policies and procedures." (*See, e.g.*, ECF No. 19-1 at 29 ("For a situation like the one presented in this

## b.    Disclosure of Mike Cook

Next, Defendant contends that its "failure to identify Mike Cook in discovery was inadvertent, was not in bad faith, and was harmless to Plaintiff." (ECF No. 27 at 5.) Defendant also contends that Sapp's discussion of Cook in his declaration "was no surprise to Plaintiff" because, during Sapp's Rule 30(b)(6) deposition on behalf of Defendant, Sapp "identified Mike Cook and testified about Mr. Cook's error in selecting the incorrect work action that led to the reporting of Plaintiff's account to the consumer reporting agencies ['CRAs']." *Id.* Defendant points out that, although Plaintiff was then "[a]ware of Mr. Cook's role in the case," Plaintiff did not subsequently "initiate any discovery dispute procedure, did not complain regarding [Defendant's] disclosures, nor sought any additional discovery after [Defendant's] 30(b)(6) deposition." *Id.* at 5 & n.3.

As an initial matter, Plaintiff correctly asserts—and Defendant concedes—that neither Defendant's initial disclosures nor its responses to Plaintiff's interrogatories identified Cook. (*See* ECF No. 22-7; ECF No. 22-9.) However, Plaintiff was aware of Cook and his relevance to Plaintiff's claims prior to Defendant's filing of the present motion. As Defendant points out, Sapp's deposition testimony referenced Cook multiple times and explicitly noted that Cook "didn't follow the appropriate work actions" in connection with Defendant's reporting of inaccurate information concerning Plaintiff. (ECF No. 22-10 at

---

Litigation where the alleged debtor claims that he is not liable for the account, pursuant to [Defendant's] *written policies and procedures* to conduct a reasonable investigation of disputes made by the alleged debtor to [Defendant]…." (emphasis added)); *id.* at 31 ("[D]espite the simple *written procedure* and measures to prevent errors related to the debtors associated with that payment, the manager who performed the work actions … made an unintentional error" (emphasis added)). To the extent Defendant seeks to rely on *written* policies and procedures that it failed to disclose to Plaintiff, that issue presents a different question. Defendant does not explain this discrepancy and does not attach any of these written policies and procedures to the present motion. Thus, for purposes of resolving the pending motion, the Court relies only upon Sapp's description in his declaration of the WinDebt workflow steps—which Defendant represents are not otherwise contained in any form of writing—but the Court does not consider Defendant's references to "written policies and procedures" that are not supported by the evidence presently before the Court.

17.) For example, Cook and his actions were discussed in the following portions of Sapp's testimony:

> Q. If it [sic] he was released from liability, why did it get updated to his credit report?
> A. Mr. Cook settled the entire account, as opposed to just the other two responsible parties and hence, the information was reported to Mr. Mahmood's credit report.
> Q. Was there something about the screen that showed you that this is Mr. Cook that caused it to be reported to all three of the credit reports?
> A. Yes.
> Q. Where do you see that?
> A. 4 /21 at 9:19.
> Q. So that refers to Mr. Cook?
> A. Yes.
> ….
> Q. And to have this credit reporting, you know not appear on Mr. Mahmood['s] credit report is there an option available to Mr. Cook just to update the other two credit reports?
> A. Yes.
> ….
> Q. Then on 4 /21/2022 is where Mr. Cook didn't follow the appropriate work actions?
> A. Correct.

*Id.* at 14–15, 17.

Sapp's testimony thus provided Plaintiff with ample notice of Cook's role in Defendant's furnishing of inaccurate information regarding Plaintiff. Because Plaintiff had been apprised of Cook's relevance to the case prior to Defendant's filing of the present motion, Defendant has demonstrated that its reliance on Sapp's testimony regarding Cook's actions could not have "surprised" Plaintiff and is accordingly harmless to Plaintiff. Notably, in the three months between Sapp's deposition and Defendant's filing of the present motion, Plaintiff did not seek any discovery regarding Cook, despite being made aware of his relevance to Plaintiff's claims. Courts have found that, where a party has been made aware of the existence and relevance of particular evidence or a potential witness, the party's subsequent failure to seek discovery does not preclude the court from

7

considering that evidence or testimony. *See Flynn v. Sephora USA, Inc.*, No. 23-55755, 2025 WL 1392132, at *1 (9th Cir. May 14, 2025) (finding that the district court did not abuse its discretion in considering a declaration from the defendant's corporate representative, despite the plaintiff's objection that the representative had not been deposed, because "[the defendant] disclosed [the corporate representative] as a person with knowledge about why [the plaintiff's] application was rejected well before moving for summary judgment, and [the plaintiff] did not file a timely motion to compel [the representative's] deposition"); *Sprayberry v. Portfolio Recovery Assocs., LLC*, No. 3:17-cv-00111-SB, No. 3:17-cv-00112-SB, 2021 WL 5183516, at *8 n.4 (D. Or. May 7, 2021) (finding the timing of the defendant's supplemental production to be harmless where the defendant disclosed supplemental procedures one month prior to the dispositive motions deadline, but plaintiff failed to "seek any additional discovery in response to the supplemental production" and "did not indicate any need for additional discovery in her motion for summary judgment"), *aff'd*, No. 21-36000, 2023 WL 5525958 (9th Cir. Aug. 28, 2023).

In sum, Plaintiff has not identified any prejudice he suffered from Defendant's failure to disclose Cook in its initial disclosures or in response to Plaintiff's interrogatories, particularly in light of the fact that Plaintiff had adequate time to seek discovery regarding Cook after Sapp's deposition. Defendant has demonstrated that Plaintiff was not prejudiced or surprised by Defendant's reliance in the present motion on Sapp's testimony concerning Cook's actions. As a result, the Court finds Defendant's failure to disclose Cook to be harmless and declines to exclude Sapp's testimony regarding Cook pursuant to Rule 37(c)(1).

### 2. Plaintiff's Hearsay Objections Regarding Mike Cook

Plaintiff also contends that Sapp's declaration and deposition testimony concerning Cook's actions are inadmissible hearsay. In its Reply brief, Defendant contends that Sapp's testimony regarding Cook is not hearsay because Sapp did not testify about any of Cook's out-of-court statements, but rather, about the company's knowledge. Specifically,

8

Defendant contends that "Mr. Sapp's 30(b)(6) testimony reflects [Defendant's] knowledge regarding the erroneous selection in the drop-down menu that led to the inaccurate reporting as derived from Mr. Cook's entries on the Account Notes and WinDebt application and is not hearsay." (ECF No. 27 at 6.)

The Court agrees with Defendant that Sapp's testimony concerning Cook's actions is not hearsay. Hearsay is "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). Sapp does not discuss any statements made by Cook, but rather describes the actions that he took. (*See, e.g.*, ECF No. 19-1 at 31 ("the manager who performed the work actions to close the Account, Mike Cook, made an unintentional error by selecting 'Close Account' instead of 'Close Debtor'"); *id.* at 33 ("Despite these procedures, Mike Cook should have processed the work action, not as 'Close ACCOUNT', but 'Close DEBTOR'…. There was no reason for this to be done, other than a human error.").)

Moreover, Sapp, as Defendant's corporate representative, may properly testify to any matter within the corporation's personal knowledge pursuant to Federal Rule of Civil Procedure 30(b)(6). *See* Fed. R. Civ. P. 30(b)(6) (providing that an organization, including a corporation such as Defendant, must designate a representative to "testify on its behalf," and "[t]he persons designated must testify about information known or reasonably available to the organization"); *see also Tijerina v. Alaska Airlines, Inc.*, No. 22-CV-203 JLS (BGS), 2024 WL 270090, at *2 (S.D. Cal. Jan. 24, 2024) (noting that the testimony of a Rule 30(b)(6) corporate representative is "'determined by the limits of the company's knowledge, not the individual's personal knowledge'" (quoting *Persian Gulf Inc. v. BP W. Coast Prod. LLC*, 632 F. Supp. 3d 1108, 1128 (S.D. Cal. 2022))). Defendant contends that Sapp's testimony regarding Cook's actions "reflects [Defendant's] knowledge regarding the erroneous selection in the drop-down menu that led to the inaccurate reporting as derived from Mr. Cook's entries on the Account Notes and WinDebt application." (ECF No. 27 at 6.) The Court concludes that such testimony, extrapolated from Sapp's review of

Defendant's records, including Plaintiff's Account Notes, and Sapp's knowledge of WinDebt's work actions, is properly within the purview of a corporate representative. The Court will accordingly consider Sapp's testimony concerning Cook's actions in ruling on the pending motion.[2]

### B.    Undisputed Facts

Defendant "is a third-party debt collector that collects debts from responsible parties that allegedly breached lease agreements and other agreements involving real property." (ECF No. 19-1 at 22.) On January 7, 2022, Crest at Sugarloaf Apartments ("Sugarloaf Apartments") placed a debt related to a lease (the "Lease") for collection with Defendant. *Id.* at 32, 39. Three liable parties—Afreen Alikhan, Mir Alikhan, and Plaintiff—were listed on this account (the "Account") for a debt in the amount of $2,735.04. *Id.* at 39.[3]

On January 20, 2022, Plaintiff called Defendant to dispute the debt, explaining that he had executed a Roommate Release that released him from liability before the debt was incurred. *Id.* Defendant subsequently received confirmation from Sugarloaf Apartments that Plaintiff was not liable for the debt on the Lease, pursuant to the Roommate Release. *Id.* at 39–40.

On February 18, 2022, Defendant removed Plaintiff as a responsible party on the Account. *Id.* at 40. Specifically, in its software application, WinDebt, Defendant used "the Close Debtor work action" and selected the reason "Close a Debtor as Recalled." *Id.* at 33, 40. When this selection was made, WinDebt "[was] programmed to automatically remove Plaintiff as a responsible party in the information furnished to the CRAs." *Id.* at 22, 30–31.

---

[2] The parties raise other evidentiary objections. (*See generally* ECF No. 27 at 2 (objecting to portions of Plaintiff's deposition testimony "as inadmissible hearsay"); ECF No. 24.) The objections to evidence not cited in this Order are denied as moot. The objections to evidence cited in this Order are overruled. It is not clear that the evidence relied upon in this Order could not be presented in an admissible form at trial. *See Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 964 n.7 (9th Cir. 2011) ("Rule 56 is precisely worded to exclude evidence only if it's clear that it cannot be presented in an admissible form at trial.").

[3] The debt was initially placed in the amount of $2,474.34, but was later revised to $2,735.04. *Id.*

However, this selection "does not remove that consumer/debtor from the Account" in order to allow Defendant "to perform additional work actions with respect to the recalled debtor if needed." *Id.* at 31. Instead, the "Close a Debtor as Recalled" selection removes that debtor from "the information furnished for the Account to the CRAs." *Id.*

On March 18, 2022, March 28, 2022, April 4, 2022, and April 18, 2022, Defendant processed information uploads on the Account to the CRAs. *Id.* at 44. Because Plaintiff had been "recalled," he was not listed as a debtor on the Account in the information furnished to the CRAs during this period of time. *Id.* at 33.

On April 20, 2022, Mir Alikhan accepted Defendant's settlement offer and paid $1,267.52 as a settlement satisfying the debt on the Account. *Id.*

On April 21, 2022, Cook, a Collection Manager for Defendant, processed the change to the Account with the work action "ACCOUNT CLOSED AS SETTLED IN FULL." *Id.* at 31, 33, 41. However, Cook selected the incorrect work action for this situation. *See id.* at 33. Instead, Cook should have selected the "Close DEBTOR" work action for the two remaining responsible parties—Mir Alikhan and Afreen Alikhan. *Id.* Cook's selection of the "Close ACCOUNT" work action caused Defendant to furnish information to the CRAs with a status code indicating "an account paid in full," along with a Special Comment Code "indicating an Account paid in full for less than the full balance." *Id.* This information was furnished "for all three debtors, as opposed to the two remaining responsible parties." *Id.* In other words, because Plaintiff had previously been "recalled" as a debtor, this status code should not have been reported for Plaintiff. *See id.*

Cook "made an unintentional error by selecting 'Close Account' instead of 'Close Debtor.'" *Id.* at 31. This was either "the equivalent of a key stroke error by inadvertently clicking the wrong function on the work action," or Cook "failed to follow his training to review the Account for the number of consumers associated with the Account and confirm whether any alleged debtor had been previously recalled—which is evident from the Account Notes for Plaintiff." *Id.* During Sapp's thirty years overseeing Defendant's

11

litigation, he is "unaware of a similar mistake leading to a consumer complaint or lawsuit." *Id.* at 32.

On April 27, 2022, Defendant processed an information upload on the Account to the CRAs, reporting the Account as "paid in full for less than the full balance." *Id.* at 33–34, 41. The reporting continued unchanged through August 29, 2022,[4] which was the final time Defendant uploaded information to the CRAs for the Account. *Id.* at 34, 41–42. These information uploads to the CRAs were reported in Plaintiff's credit file. (*See* ECF Nos. 22-15 at 5–6; ECF No. 22-16 at 3; ECF No. 22-17 at 6 (listing Defendant's Account as either an account with "adverse information," a "potentially negative" account, or under the heading "collections" on Plaintiff's credit reports from three CRAs).)

In June 2022, while in the process of applying for a home equity line of credit ("HELOC"), Plaintiff learned that Defendant's Account was appearing in his credit file as an account "paid in full for less than the full balance." (ECF No. 19-1 at 56–59.)

---

[4] Plaintiff and Defendant dispute the number of times Defendant uploaded the information regarding Plaintiff to the CRAs. Plaintiff contends that the information was reported for "88 consecutive weeks" (ECF No. 22 at 22), but Defendant contends that Plaintiff is relying on inaccurate information. Specifically, Defendant contends that the errata sheet for Sapp's deposition testimony shows that while Sapp originally testified that Defendant reports accounts to the CRAs "weekly," Sapp corrected his testimony to instead state that Defendant "report[s] most accounts weekly." (ECF No. 27 at 15.) Sapp's declaration also states that, although Defendant's "normal course" is to make weekly uploads to the CRAs, Defendant "had some issues with corrupt uploads during this time period," and so the information on this Account was not transmitted to the CRAs on a weekly basis. (ECF No. 19-1 at 34.) Defendant contends that its evidence "conclusively shows the <u>exact</u> dates on which Plaintiff's account information was transmitted, which occurred for ten weeks to each of the three the [sic] CRAs, not the 88 [weeks] cited by Plaintiff." (ECF No. 27 at 10 (citing ECF No. 19-1 at 41–42, which contains the "Account Notes" for Plaintiff's Account with Defendant and documents each date the Account was "reported to credit bureaus," spanning from 04/27/2022 to 08/29/2022).) Defendant contends that, based upon the Account Notes, "[i]f each reporting to each CRA were a violation, then the maximum number of times the information was reported was ten occurrences to each of the three CRAs." *Id.* Plaintiff provides no evidence—other than Sapp's deposition testimony discussing "weekly" uploads, which Sapp subsequently corrected—demonstrating that the Account was reported to the CRAs on any occasions other than those documented in Defendant's evidence. Accordingly, Plaintiff fails to create a genuine dispute of material fact as to whether Defendant reported the information on dates other than the dates specified in Defendant's Account Notes.

Subsequently, Plaintiff took no action to have Defendant's tradeline removed from his credit file until September 2023. *See id.* at 153.

On May 5, 2023, Loan Factory issued a preapproval letter to Plaintiff, which preapproved him for a 30-year mortgage loan with an interest rate of 6.5%. (ECF No. 22-3 at 2.)[5]

On October 11, 2023, Plaintiff closed on a property with a 30-year mortgage loan with an interest rate of 7.625% through Loan Factory. (ECF No. 22-4 at 2–3.)

On October 24, 2023, Plaintiff sent dispute letters to the CRAs, disputing Defendant's Account. (*See generally* ECF Nos. 22-11, 22-12, 22-13, 22-14.)

On November 22, 2023, Defendant processed and investigated Plaintiff's dispute. (ECF No. 19-1 at 35.) On November 24, 2023, and December 1, 2023, Defendant requested that the CRAs delete the Account. *Id.* at 35, 42.

On January 31, 2024, Plaintiff filed the Complaint against Defendant. (ECF No. 1.)

## III.    SUBJECT MATTER JURISDICTION

As a preliminary matter, the Court considers whether it may properly exercise subject matter jurisdiction over this action in light of Plaintiff's concession that Defendant is entitled to summary judgment on Plaintiff's sole federal claim. (*See* ECF No. 22 at 7 n.1 (stating that Plaintiff "does not oppose [Defendant's] Motion as to the Fair Debt Collection Practices Act").) Although Plaintiff originally filed this action under federal question jurisdiction and supplemental jurisdiction (*see* Compl. ¶ 9), Plaintiff now contends that the Court may properly exercise diversity jurisdiction over Plaintiff's remaining state-law claim.[6]

---

[5] Defendant objects to the Court's consideration of the preapproval letter. Defendant's objections are addressed *infra* at 26–27.

[6] The Court notes that granting summary judgment to Defendant on Plaintiff's sole federal claim would not destroy supplemental jurisdiction over Plaintiff's state-law CCRAA claim. However, because the Court concludes that diversity jurisdiction exists, the Court declines to address supplemental jurisdiction as an alternative basis for subject matter jurisdiction.

"Federal courts are courts of limited jurisdiction" that "possess only that power authorized" by the United States Constitution and federal law. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Accordingly, federal courts "have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006); *see also Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999) ("Article III generally requires a federal court to satisfy itself of its jurisdiction over the subject matter before it considers the merits of a case."). "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3). The burden of establishing the Court's jurisdiction "rests on the party asserting jurisdiction." *Kokkonen*, 511 U.S. at 377.

In federal court, subject matter jurisdiction may arise from either "federal question jurisdiction" or "diversity jurisdiction." *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987); *see also* 28 U.S.C. §§ 1331, 1332. To invoke diversity jurisdiction, the complaint must allege that "the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between ... citizens of different States ... [or] citizens of a State and citizens or subjects of a foreign state[.]" 28 U.S.C. § 1332(a). Section 1332 "requires complete diversity of citizenship; each of the plaintiffs must be a citizen of a different state than each of the defendants." *Morris v. Princess Cruises, Inc.*, 236 F.3d 1061, 1067 (9th Cir. 2001) (citation omitted). For purposes of determining diversity jurisdiction, a corporation is a citizen of "every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business." 28 U.S.C. § 1332(c)(1). "The natural person's state of citizenship is [ ] determined by [his] state of domicile[.]" *Kanter v. Warner-Lambert Co.*, 265 F.3d 853, 857 (9th Cir. 2001).

Here, it is undisputed that the parties are diverse. The parties agree that Plaintiff is a citizen of California, and Defendant is incorporated in Georgia, with its principal place of business in Georgia. The only remaining question, then, is whether the amount in controversy requirement is satisfied to support diversity jurisdiction.

Plaintiff contends that, when combined, his pecuniary loss, emotional distress, punitive damages, and attorneys' fees "far exceed the $75,000 threshold to satisfy the amount in controversy prong." (ECF No. 31 at 3.) Defendant contends that "the Court may consider [Defendant's] summary judgment evidence on this jurisdictional issue." (ECF No. 32 at 1.) Defendant contends that the "summary judgment record proves to a legal certainty that Plaintiff's alleged economic and non-economic injuries do not exceed $75,000" based upon Defendant's contentions in the pending Motion for Summary Judgment that Plaintiff has failed to raise a triable issue of fact as to his economic damages, emotional distress damages, and Defendant's willfulness. (ECF No. 30 at 3.)

Defendant primarily contends that the Court should apply the "legal certainty" test and find that Defendant's pending summary judgment motion has established to a "legal certainty" that Plaintiff cannot recover more than $75,000 in connection with his CCRAA claim. When a case is originally filed in federal court, "the amount in controversy is determined from the face of the pleadings." *Crum v. Circus Circus Enters.*, 231 F.3d 1129, 1131 (9th Cir. 2000). "To justify dismissal of a claim originally filed in federal court on the basis that the alleged amount in controversy is insufficient to confer jurisdiction, the Court applies the 'legal certainty' test, which requires that it appears to a legal certainty that the claim is really for less than the jurisdictional amount." *Hammett v. Sherman*, No. 19cv605-LL-AHG, 2022 WL 4793495, at *3 (S.D. Cal. Sept. 30, 2022) (citing *Geographic Expeditions, Inc. v. Est. of Lhotka*, 599 F.3d 1102, 1106 (9th Cir. 2010)). Legal certainty is established when (1) the terms of a contract limit the plaintiff's possible recovery, (2) plaintiff's damages are limited by a specific rule of law or measure of damages, or (3) independent facts show the amount of damages have been selected merely to obtain federal diversity jurisdiction. *See Naffe v. Frey*, 789 F.3d 1030, 1040 (9th Cir. 2015), *abrogation on other grounds recognized by Garnier v. O'Connor-Ratcliff*, 136 F.4th 1181 (9th Cir. 2025).

Typically, courts apply the "legal certainty" test when subject matter jurisdiction is challenged at the outset of the case (either upon the filing of a Rule 12(b)(1) motion or a

motion to remand), not at the summary judgment stage. The Court notes that, when evaluating for the first time at the summary judgment stage whether the amount-in-controversy requirement is satisfied, two principles appear to be in tension—(1) the principle that "[e]vents occurring subsequent to the institution of suit which reduce the amount recoverable below the statutory limit do not oust jurisdiction," *Singer v. State Farm Mut. Auto. Ins.*, 116 F.3d 373, 375 (9th Cir. 1997) (quoting *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 289–90 (1938)), and (2) the principle that the amount in controversy will be deemed insufficient if it appears to a "legal certainty" that the claim is for less than the jurisdictional amount, *Naffe*, 789 F.3d at 1040. The Court notes, however, that "[t]he weight of authority" is that "'even if part of the plaintiff's claim is dismissed, for example, on a motion for summary judgment, thereby reducing the plaintiff's remaining claim below the requisite amount in controversy, the district court retains jurisdiction to adjudicate the balance of the claim.'" *Barefield v. HSBC Holdings PLC*, 356 F. Supp. 3d 977, 984 (E.D. Cal. 2018) (quoting 14AA Wright & Miller's Federal Practice & Procedure § 3702.4 (4th ed. 2018)), *aff'd*, 834 F. App'x 438, 439 (9th Cir. 2021) ("[D]iversity jurisdiction is determined at the time the action commences, and a federal court is not divested of jurisdiction if … the amount in controversy subsequently drops below the minimum jurisdictional level." (quoting *Hill v. Blind Indus. & Servs. of Md.*, 179 F.3d 754, 757 (9th Cir. 1999))). The reasoning of *Barefield* would thus support that, in determining whether the amount in controversy is met, the Court should consider all of Plaintiff's theories of recovery alleged in the Complaint—even the theories that do not survive Defendant's pending summary judgment motion.

In the present case, however, the Court need not reach a conclusion on this issue, because even if the Court were limited to considering only Plaintiff's theories of recovery that survive Defendant's Motion for Summary Judgment, the Court would find that Plaintiff has sufficiently established that the amount in controversy exceeds $75,000. For one matter, Plaintiff's responses to the Order to Show Cause state that Plaintiff's attorneys' fees alone are anticipated to exceed $75,000. Attorneys' fees are properly considered as

part of the amount in controversy when the statute at issue provides for their recovery. *See Fritsch v. Swift Transp. Co. of Ariz., LLC*, 899 F.3d 785, 793 (9th Cir. 2018) ("Among other items, the amount in controversy includes damages (compensatory, punitive, or otherwise), the costs of complying with an injunction, and attorneys' fees awarded under fee-shifting statutes or contract."). The statute at issue in this case—the CCRAA—provides for the recovery of attorneys' fees. *See* Cal. Civ. Code § 1785.31(d) (providing that, except under certain circumstances inapplicable to this case,[7] "the prevailing plaintiffs in any action commenced under this section shall be entitled to recover court costs and reasonable attorney's fees."). Importantly, the Ninth Circuit has stated that, when determining whether the amount in controversy requirement has been met, courts may "estimat[e] future attorneys' fees" by relying on "'their own knowledge of customary rates and their experience concerning reasonable and proper fees.'" *Fritsch*, 899 F.3d at 795 (quoting *Ingram v. Oroudjian*, 647 F.3d 925, 928 (9th Cir. 2011)); *see also Cain v. Hartford Life & Accident Ins. Co.*, 890 F. Supp. 2d 1246, 1250 (C.D. Cal. 2012) ("When assessing the amount in controversy, the court considers the amount of attorneys' fees to be accrued throughout the entirety of the litigation.").

Here, in response to the Order to Show Cause, "[Plaintiff's] counsel estimates that the attorneys' fees required to litigate this case will exceed $75,000, given the contentious nature of the matter, which involved voluminous written discovery, multiple depositions, and substantial summary judgment briefing." (ECF No. 31 at 6.) Notably, Plaintiff's counsel's estimated figure does not appear to account for additional future fees that could be incurred in the continued litigation of this case, including representing Plaintiff in a potential jury trial following the resolution of the pending summary judgment motion.

---

[7] Specifically, except as provided in subdivision (e), which states: "If a plaintiff brings an action pursuant to this section against a debt collector … and the basis for the action is related to the collection of a debt, whether issues relating to the debt collection are raised in the same or another proceeding, the debt collector shall be entitled to recover reasonable attorney's fees upon a finding by the court that the action was not brought in good faith." Cal. Civ. Code § 1785. 31(e).

Additionally, Plaintiff cites a recent case where another judge in the Southern District of California awarded one of Plaintiff's attorneys, Matthew Loker, $82,650.15 in fees for litigating that plaintiff's CCRAA and Fair Credit Reporting Act ("FCRA") claims. *Id.* (citing *Lardizabal v. Am. Express Nat'l Bank*, No. 22-cv-345-MMA (BLM), 2023 WL 8264435, at *7, *10 (S.D. Cal. Nov. 29, 2023) (finding $650 to be a reasonable hourly rate for Mr. Loker)). The Court thus concludes that, based upon the representations of Plaintiff's counsel, as well as the Court's "knowledge of customary rates and [the Court's] experience concerning reasonable and proper fees," *Fritsch*, 899 F.3d at 795, the Court can reasonably estimate that Plaintiff's attorneys' fees alone in this matter will exceed $75,000.[8]

Some courts have found that attorneys' fees alone can support a finding that the amount-in-controversy requirement is met. *See, e.g.*, *Huff v. Kemper Indep. Ins. Co.*, No. CV 20-10953 PA (JEMx), 2021 WL 351975, at *4 (C.D. Cal. Feb. 1, 2021) ("The Court may 'use its discretion to determine, within its own experience, that an award of attorneys' fees alone will satisfy the amount in controversy requirement.'" (quoting *Cain*, 890 F. Supp. 2d at 1250)). However, the Court need not rely on Plaintiff's attorneys' fees alone, because Plaintiff also seeks to recover damages, including economic damages and emotional distress damages. As discussed in more detail below, there is a genuine dispute of material fact as to whether Plaintiff received a higher interest rate on his mortgage loan due to Defendant's inaccurate reporting.[9] Specifically, Plaintiff was preapproved for a

---

[8] At oral argument, Defendant's counsel contended that Plaintiff might not recover attorneys' fees in this action because Plaintiff had previously rejected an Offer of Judgment. However, the Offer of Judgment has not been filed on the docket, and Defendant did not mention the Offer of Judgment or its potential effect on Plaintiff's recovery of attorneys' fees in the briefing responding to the Court's Order to Show Cause. Moreover, Defendant's argument appears to rely on an assumption that Plaintiff will ultimately obtain a judgment that "is not more favorable than the unaccepted offer." Fed. R. Civ. P. 68(d). At this stage of the proceedings, the Court concludes that it may properly consider Plaintiff's estimated attorneys' fees when determining whether the amount-in-controversy requirement is satisfied.

[9] In its summary judgment motion, Defendant contends that Plaintiff has failed to raise a triable dispute of material fact as to his economic damages. Defendant's contentions are addressed *infra* at 21–28.

30-year mortgage with an interest rate of 6.5%, but he later received a loan for a 30-year mortgage with an interest rate of 7.625%. (*Compare* ECF No. 22-3 at 2, *with* ECF No. 22-4 at 2.) Although Plaintiff does not provide a precise figure quantifying the damages he suffered from the difference between these interest rates—instead, Plaintiff contends that he "will ask the jury to assign a monetary value to the out-of-pocket financial harm he sustained" (ECF No. 31 at 3)—the Court assumes that Plaintiff's potential damages could be significant, particularly if the different interest rates are compared over the span of a thirty-year mortgage. Nevertheless, because Plaintiff's attorneys' fees alone are reasonably estimated to exceed $75,000, adding even a minimal amount of potential economic damages to his attorneys' fees would only further confirm that the amount-in-controversy requirement is satisfied. *See Arias v. Residence Inn by Marriott*, 936 F.3d 920, 927 (9th Cir. 2019) (explaining that the amount in controversy "'is simply an estimate of the total amount in dispute,'" and "reflects the maximum recovery the plaintiff could reasonably recover" (quoting *Lewis v. Verizon Commc'ns, Inc.*, 627 F.3d 395, 400 (9th Cir. 2010))).[10]

In sum, the Court concludes that Plaintiff and Defendant are diverse, and the amount in controversy exceeds $75,000. The Court may properly exercise diversity jurisdiction over Plaintiff's remaining state-law CCRAA claim. The Order to Show Cause (ECF No. 28) is discharged.

## IV.    DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### A.    Legal Standard

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

---

[10] The Court finds that the amount-in-controversy requirement is satisfied by Plaintiff's prospective attorneys' fees and economic damages alone. Accordingly, the Court does not consider Plaintiff's additional bases for recovery.

56(a). "A material fact is one that is relevant to an element of a claim or defense, and whose existence might affect the outcome of the case." *See United States v. Grayson*, 879 F.2d 620, 622 (9th Cir. 1989) (citation omitted). The materiality of a fact is determined by the substantive law governing the claim or defense. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986).

The moving party has the initial burden of demonstrating that summary judgment is proper. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 153 (1970). Where the party moving for summary judgment bears the burden of proof at trial, the moving party "'must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'" *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992) (quoting *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264–65 (5th Cir. 1991)). Where the party moving for summary judgment does not bear the burden of proof at trial, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325; *see also United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1542–43 (9th Cir. 1989) ("[O]n an issue where the plaintiff has the burden of proof, the defendant may move for summary judgment by pointing to the absence of facts to support the plaintiff's claim. The defendant is not required to produce evidence showing the absence of a genuine issue of material fact with respect to an issue where the plaintiff has the burden of proof. Nor does Rule 56(c) require that the moving party support its motion with affidavits or other similar materials *negating* the nonmoving party's claim." (citations and internal quotation marks omitted)).

If the moving party meets the initial burden, the burden shifts to the opposing party to show that summary judgment is not appropriate. *Anderson*, 477 U.S. at 256; *Celotex Corp.*, 477 U.S. at 322, 324. The nonmoving party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the

[nonmoving party's] position will be insufficient[.]"). The nonmoving party must "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324 (quotations omitted). The nonmoving party's evidence "is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. However, "'[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial,' and summary judgment is appropriate." *Zetwick v. County of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (quoting *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009)).

## B.    FDCPA Claim

In its Motion for Summary Judgment, Defendant contends that it is entitled to summary judgment on Plaintiff's FDCPA claims in Count I of the Complaint because (1) Defendant did not engage in any collection activity, rendering the FDCPA inapplicable to the conduct about which Plaintiff complains, (2) Plaintiff's FDCPA claim is barred by the one-year statute of limitations, and (3) Defendant is entitled to summary judgment on its bona fide error affirmative defense. (*See* ECF No. 19 at 3–6.) In response, Plaintiff states that he "does not oppose [Defendant's] Motion as to the Fair Debt Collection Practices Act." (ECF No. 22 at 7 n.1.)

Accordingly, Defendant's Motion for Summary Judgment is granted as to Plaintiff's FDCPA claim. Only Plaintiff's CCRAA claim remains pending.

## C.    Article III Standing

Defendant contends that the Court should find that Plaintiff lacks Article III standing because Plaintiff has no competent evidence demonstrating that he incurred actual damages, or, in the alternative, Defendant seeks a ruling that, "[a]t a minimum," "Plaintiff has failed to establish economic damages." (ECF No. 19 at 3.) Defendant contends that Plaintiff's evidence of a mere statutory violation is insufficient to confer Article III standing because "an injury in law is not an injury in fact." *Id.* at 15. In particular, Defendant contends that Plaintiff cannot base his standing upon his alleged economic

damages, as Plaintiff lacks competent evidence to support these damages. Plaintiff alleges that he suffered various economic damages as a result of Defendant's inaccurate reporting, including a higher interest rate on his mortgage, a higher HELOC interest rate, and lost credit opportunities. (*See* ECF No. 19-1 at 163–64 (listing Plaintiff's claimed damages in response to Defendant's interrogatories).) Defendant also contends that Plaintiff's request for damages based upon emotional distress is not sufficiently concrete to support standing. (*See* ECF No. 19 at 16–18.)

The Article III standing doctrine limits federal court jurisdiction. *See La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1087 (9th Cir. 2010). "[T]he 'irreducible constitutional minimum' of standing consists of three elements." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). In order to satisfy Article III's standing requirements, a plaintiff must show "(i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citing *Lujan*, 504 U.S. at 560–61). "'The party invoking federal jurisdiction bears the burden of establishing these elements [of Article III standing] … with the manner and degree of evidence required at the successive stages of the litigation.'" *Ctr. for Biological Diversity v. Exp.-Imp. Bank of the U.S.*, 894 F.3d 1005, 1012 (9th Cir. 2018) (quoting *Lujan*, 504 U.S. at 561). "Thus, at the summary judgment stage, a plaintiff must offer evidence and specific facts demonstrating each element." *Id.*

With respect to Plaintiff's economic damages, Defendant contends that Plaintiff has produced no evidence, other than hearsay deposition testimony, that he was quoted or offered an interest rate of 7.19% for his mortgage loan before receiving his mortgage loan with an actual interest rate of 7.625%. Defendant contends that, although Plaintiff produced a preapproval letter offering him a mortgage loan with an interest rate of 6.5%, Plaintiff failed to produce any evidence "substantiating what interest rate he would have received on or about September 28, 2023, had [Defendant] not reported the alleged Account" and

that Plaintiff also failed to "present any evidence regarding the impact of [Defendant's] tradeline on his credit scores." (ECF No. 19 at 20.) Defendant further contends that Plaintiff has not produced any competent evidence to support that he received a higher HELOC interest rate or lost credit opportunities because of Defendant's alleged violations of the CCRAA.

Plaintiff contends that, despite receiving preapproval for a 6.5% interest rate on a mortgage loan in May 2023, "[t]he existence of [Defendant's] reporting, however, force[d] [Plaintiff] into a 7.625% interest rate when he finally obtained his mortgage" in October 2023. (ECF No. 22 at 17.) To support this contention, Plaintiff submits a preapproval letter issued by Loan Factory on May 5, 2023, stating that Plaintiff was preapproved for a loan amount of $1,600,000 with a "Note Rate" of 6.5%. (ECF No. 22-3 at 2.) Plaintiff also submits a document with the terms of the mortgage loan Plaintiff subsequently obtained from Loan Factory in October 2023 with an increased interest rate of 7.625%. (ECF No. 22-4 at 2.) In addition, Plaintiff submits his credit reports generated by three CRAs on October 10, 2023. Each of these reports demonstrates that, as of October 10, 2023, Defendant's Account was the sole "adverse" or "potentially negative" account listed in Plaintiff's credit file. (*See* ECF No. 22-15 at 5–6 (listing Defendant's Account under the heading "Accounts with Adverse Information" and including in "Remarks" for the Account that it was "SETTLED-LESS THAN FULL BLNC<; >PAID COLLECTION<"); ECF No. 22-16 at 3 (listing Defendant's Account as "POTENTIALLY NEGATIVE"); ECF No. 22-17 at 6 (listing Defendant's Account under the heading "Collections").) These reports also indicate that the first time Loan Factory made an "inquiry" into Plaintiff's credit file was on September 21, 2023—after Loan Factory had issued the preapproval letter offering a 6.5% interest rate in May 2023, and prior to Loan Factory issuing the mortgage loan with an increased interest rate of 7.625% in October 2023. (*See* ECF No. 22-15 at 8 (listing a "regular inquiry" by Loan Factory on 09/21/2023); ECF No. 22-16 at 6 (listing a "hard inquiry" by ADVANTAGE CREDIT INC "on behalf of LOAN FACTORY" on

09/21/2023); ECF No. 22-17 at 4 (listing a "hard inquiry" by LOAN FACTORY on "Sep 21, 2023").)

Notably, each credit report lists inquiries into Plaintiff's credit file that occurred prior to May 5, 2023, when Loan Factory issued the preapproval letter. (*See, e.g.*, ECF No. 22-15 at 8 (listing an inquiry by TD AUTO FINANCE requested on 12/21/2021); ECF No. 22-16 at 8 (listing an inquiry by SAN DIEGO COUNTY C U on 05/02/2023); ECF No. 22-17 at 5 (listing an inquiry by EQUIFAX UPDATE on Dec 21, 2021).) In other words, the fact that each credit report lists inquiries pre-dating Loan Factory's issuance of Plaintiff's preapproval letter gives rise to a reasonable inference that, if Loan Factory had conducted an inquiry into Plaintiff's credit file prior to issuing the preapproval letter on May 5, 2023, the inquiry would have been listed on these reports. This in turn leads to a reasonable inference that Loan Factory was not aware of the reporting of Defendant's Account in Plaintiff's credit file when it preapproved Plaintiff for a mortgage loan with an interest rate of 6.5% in May 2023. Additionally, Plaintiff testified in his deposition that he had asked his loan officer from Loan Factory who had "worked on [his] loan in [the] past" if she could provide "a pre-approval letter without running any credits, because [he] didn't want any hard credit run on [his] report." (ECF No. 19-1 at 146–47.) Plaintiff's testimony thus also indicates that Loan Factory did not conduct an inquiry into Plaintiff's credit file prior to issuing the preapproval letter and accordingly was not aware of Defendant's Account when it provided Plaintiff with the preapproval letter offering a lower interest rate.

Thus, drawing all reasonable inferences in Plaintiff's favor, as the Court must at the summary judgment stage, Plaintiff's evidence suggests that Loan Factory initially offered Plaintiff a more favorable interest rate of 6.5% in the preapproval letter *before* reviewing Plaintiff's credit file, but *after* reviewing Plaintiff's credit file—where Defendant's Account was the only "adverse" or "potentially negative" account listed—Loan Factory issued a mortgage loan with a higher interest rate of 7.625%. In other words, Plaintiff's evidence creates a genuine dispute of material fact as to whether Loan Factory increased the interest rate on Plaintiff's mortgage loan due to Loan Factory's review of Defendant's

inaccurate reporting in Plaintiff's credit file. The Court finds that, with all justifiable inferences drawn in Plaintiff's favor, the evidence described above creates a genuine dispute of material fact as to whether Defendant's inaccurate reporting caused Plaintiff to suffer economic damages in the form of an increased interest rate on his mortgage loan.[11]

Defendant also contends that Plaintiff cannot demonstrate that Defendant's reporting of the Account caused Plaintiff to receive a higher interest rate because after August 2022, Defendant's tradeline would not have impacted Plaintiff's credit score due to the use of an "XB code" indicating that the Account was "disputed." (ECF No. 19 at 20.) However, Defendant fails to provide sufficient evidence to support its contention that its reporting would not impact Plaintiff's credit score. Specifically, Defendant contends that in August 2022, Mir Alikhan requested deletion of the Account, causing Defendant to mark the Account as "disputed" by using the "XB" Compliance Condition Code, which indicates "Account information disputed by consumer under the Fair Credit Reporting Act." (ECF No. 19-1 at 53.) Sapp states in his declaration that, "[b]ased on credit and credit scoring experts hired by [Defendant], [Defendant] understands that, when the XB code is included on an account, such account is removed from any credit score determinations. Meaning, this Account would no longer positively or negatively affect the consumer's credit score for the remaining parties on the Account, including Plaintiff[.]" *Id.* at 34. Notably, however, Defendant has not disclosed any experts in this action, and it identified no experts and submitted no expert reports in conjunction with its motion. Plaintiff contends that

---

[11] In reaching this conclusion, the Court does not rely on Plaintiff's deposition testimony that Defendant challenges as hearsay. Specifically, Plaintiff referenced an interest rate of 7.19% during his deposition and in his interrogatories. (*See* ECF No. 22-5 at 35–36; ECF No. 19-1 at 164.) Plaintiff's deposition testimony indicates that Plaintiff was referencing historical interest rates when discussing the 7.19% rate. (*See* ECF No. 22-5 at 35–36.) However, evidence of historical rates was not submitted to the Court in connection with the pending Motion. Moreover, Plaintiff confirmed during his deposition that no bank or lender actually offered him a rate of 7.19%. *See id.* Plaintiff also testified in his deposition that Ms. Mangrolia, his loan officer with Loan Factory, told him that Defendant's reporting was affecting his credit score and interest rate on the mortgage. *See id.* at 16. The Court agrees with Defendant that Plaintiff's deposition testimony regarding historical mortgage rates and Ms. Mangrolia's statements is impermissible hearsay that cannot create a genuine dispute of material fact as to Plaintiff's ability to recover economic damages.

Defendant's references to these experts' conclusions are inadmissible as hearsay. (ECF No. 24 at 36.) The Court agrees with Plaintiff that Defendant's reliance on conclusions reached by these undisclosed experts is hearsay and cannot properly be considered in resolving this motion.[12] The Court accordingly does not consider Defendant's assertion that the "XB" compliance code would have prevented Defendant's tradeline from impacting Plaintiff's credit score. Moreover, even if the Court were to consider Defendant's general assertions regarding how the "XB" compliance code typically affects consumers' credit scores, this information would not conclusively establish that Loan Factory did not consider the information about Defendant's Account that was reported in Plaintiff's credit report. In other words, a genuine dispute of material fact remains as to this issue.

Finally, Defendant contends in its Reply brief that the 6.5% interest rate in the preapproval letter was "never locked in or guaranteed and was, therefore, subject to change," citing an article from a website called "The Mortgage Reports" in support of this proposition. (ECF No. 27 at 2 n.1.) For one matter, Defendant raises this argument for the first time in its Reply brief. *See United States v. Bohn*, 956 F.2d 208, 209 (9th Cir. 1992) (noting that courts generally decline to consider arguments raised for the first time in a reply brief). For another matter, Defendant provides no basis upon which the Court may properly consider the assertions in the website article cited by Defendant. *See, e.g.*, *MACOM Tech. Sols. Inc. v. Litrinium, Inc.*, No. SACV 19-220 JVS (JDEx), 2019 WL 4282906, at *1 (C.D. Cal. June 3, 2019) ("Courts may take judicial notice of the fact that

---

[12] Although Sapp's declaration states that "[Defendant] is familiar with the XB codes and this mitigation policy, pursuant to its efforts to comply with the requirements of the FCRA," the declaration goes on to explicitly state that Defendant is familiar with this information due, at least in part, to its "engagement of credit experts familiar with the credit scoring models and processes." (*See* ECF No. 19-1 at 36 ("[Defendant] is familiar with the XB codes and this mitigation policy, pursuant to its efforts to comply with the requirements of the FCRA, including the review of materials furnished by the CRAs, general industry resources, information from and the engagement of credit experts familiar with the credit scoring models and processes to assist [Defendant] in complying with the FCRA."); *cf. Zeiger v. WellPet LLC*, 526 F. Supp. 3d 652, 678 (N.D. Cal. 2021) (concluding that a corporate representative could not opine as to "plainly specialized knowledge that requires expertise," even if the corporate representative "may have acquired this knowledge during the course of his job").

24-cv-203-WQH-KSC

an internet article is available to the public, but it may not take judicial notice of the truth of the matters asserted in the article." (quoting *Spy Optic, Inc. v. Alibaba.Com, Inc.*, 163 F. Supp. 3d 755, 762 (C.D. Cal. 2015))). In any event, even if the Court were to consider Defendant's contention that the interest rate in the preapproval letter was "subject to change" (ECF No. 27 at 2 n.1), this argument does not negate the possibility that the reason the interest rate subsequently increased was because Loan Factory reviewed Plaintiff's credit file and observed the information regarding Defendant's Account on Plaintiff's credit report.

The Court finds that Plaintiff's evidence creates a genuine dispute of material fact as to whether Loan Factory increased the interest rate on Plaintiff's mortgage loan because it reviewed Plaintiff's credit report and was influenced by Defendant's Account being reported as settled for "less than the full balance." A genuine dispute of material fact accordingly exists as to whether Plaintiff suffered economic damages—in the form of an increased interest rate—that were "caused by the defendant." *TransUnion LLC*, 594 U.S. at 423. Economic harm is a sufficiently concrete injury to support standing. *See id.* at 425 ("If a defendant has caused physical or monetary injury to the plaintiff, the plaintiff has suffered a concrete injury in fact under Article III."). Plaintiff has thus produced sufficient evidence to create a genuine dispute of material fact as to whether he suffered economic damages by receiving a higher interest rate on his mortgage loan due to Defendant's reporting of inaccurate information. This in turn creates a genuine dispute of material fact as to Plaintiff's Article III standing, which is sufficient to survive Defendant's challenge to standing at this stage of the proceedings. *See Nader & Sons, LLC v. Namvar*, No. 23-55167, 2024 WL 3023184, at *2 (9th Cir. June 17, 2024) ("[A]t the summary judgment stage the plaintiffs need not establish that they in fact have standing, but only that there is a genuine question of material fact as to the standing elements." (quoting *Cent. Delta Water Agency v. United States*, 306 F.3d 938, 947 (9th Cir. 2002))).

The Court accordingly denies Defendant's request to dismiss Plaintiff's claim for lack of Article III standing. The Court also denies Defendant's alternative request for summary judgment on Plaintiff's claim for economic damages.[13]

### D.    Bona Fide Error Defense

Defendant also contends that it is entitled to judgment as a matter of law on its "bona fide error" defense to Plaintiff's CCRAA claim. Specifically, Defendant contends that it maintains reasonable procedures to prevent violations of the CCRAA, and the inaccurate reporting of information concerning Plaintiff was caused by an unintentional error that occurred despite Defendant's reasonable procedures.

The CCRAA provides that "[a] person shall not furnish information on a specific transaction or experience to any consumer credit reporting agency if the person knows or should know the information is incomplete or inaccurate." Cal. Civ. Code § 1785.25(a).[14] Under the CCRAA, "[a] person who furnishes information to a consumer credit reporting agency is liable for failure to comply with this section, unless the furnisher establishes by a preponderance of the evidence that, at the time of the failure to comply with this section, the furnisher maintained reasonable procedures to comply with those provisions." Cal. Civ. Code § 1785.25(g). Thus, the burden is on Defendant, as the furnisher, to establish by a preponderance of the evidence that it "maintained reasonable procedures" to comply with the CCRAA.

In determining whether a defendant has established this defense, the critical questions are whether the defendant's procedures "were (1) 'reasonably adapted to avoid

---

[13] Because the Court concludes that Plaintiff has raised a genuine dispute of material fact as to his ability to recover economic damages from Defendant based upon the increased interest rate on his mortgage, the Court need not reach Defendant's alternative arguments regarding standing, including Defendant's challenges to Plaintiff's other forms of economic damages and Defendant's contention that Plaintiff's alleged emotional injuries are not sufficiently concrete to establish Article III standing.

[14] The CCRAA defines "person" to include, *inter alia*, "any … corporation … or other entity." Cal. Civ. Code § 1785.3(k).

the error' and (2) actually maintained." *Gao v. Campus 150 Venture II, LLC*, No. SACV 20-01355 DPP (ADSx), 2022 WL 294749, at *5 (C.D. Cal. Jan. 31, 2022) (quoting *Reichert v. Nat'l Credit Sys., Inc.*, 531 F.3d 1002, 1006 (9th Cir. 2008)) (concluding that disputes of fact as to both questions precluded summary judgment on the defendant's bona fide error defense with respect to, *inter alia*, the plaintiff's CCRAA claim). In the FCRA context,[15] the Ninth Circuit has held that "[t]he reasonableness of the procedures and whether the agency followed them will be jury questions in the overwhelming majority of cases." *Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329, 1333 (9th Cir. 1995); *see also Doherty v. Microbilt Corp.*, No. 2:22-cv-03891-SPG-PVC, 2025 WL 1090401, at *8 (C.D. Cal. Mar. 6, 2025) (noting that, in the Ninth Circuit, "a plaintiff's burden of production on the issue of reasonable procedures 'is so minimal that in the overwhelming majority of cases a jury could infer the unreasonableness of a defendant's procedures from the fact that those procedures permitted an inaccuracy to occur.'" (quoting *Saenz v. Trans Union, LLC*, 621 F. Supp. 2d 1074, 1080 (D. Or. 2007))). As a result, courts regularly decline to grant summary judgment on a bona fide error defense. *See, e.g., Tourgeman v. Collins Fin. Servs., Inc.*, No. 08-cv-1392-CAB (NLS), 2015 WL 11613279, at *4 (S.D.

---

[15] "[B]ecause the CCRAA 'is substantially based on the Federal [FCRA], judicial interpretation of the federal provisions is persuasive authority and entitled to substantial weight when interpreting the California provisions.'" *Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 889 (9th Cir. 2010) (quoting *Olson v. Six Rivers Nat'l Bank*, 111 Cal. App. 4th 1, 12 (Ct. App. 2003)). At oral argument, counsel for Defendant referenced this proposition that judicial interpretations of the FCRA are entitled to "substantial weight" when interpreting the CCRAA and questioned whether Plaintiff could pursue a CCRAA claim against Defendant despite being unable to assert an FCRA claim against Defendant for the same conduct. However, several courts have acknowledged that the CCRAA "imposes civil liability for a broader range of conduct than the FCRA." *Venugopal v. Citibank, NA*, No. 12-2452 CW, 2013 WL 1365992, at *2 (N.D. Cal. Apr. 3, 2013); *see also Mortimer v. JP Morgan Chase Bank, Nat'l Ass'n*, No. 12-1936 CW, 2012 WL 3155563, at *5 (N.D. Cal. Aug. 2, 2012) ("Unlike the FCRA, the CCRAA includes a private right of action to enforce the prohibition against supplying incomplete or inaccurate consumer credit information."); *Green-Browning v. Experian Info. Sols., Inc.*, No. 16-cv-04638-BLF, 2017 WL 4340351, at *4 (N.D. Cal. Sept. 29, 2017) (noting that the "general proposition that judicial interpretation of the FCRA is 'entitled to substantial weight when interpreting' the CCRAA" does not negate the fact that the CCRAA "lacks [the FCRA's] CRA-dispute-notification trigger" (citations omitted)).

Cal. May 12, 2015) (concluding, in an FDCPA case,[16] that "whether [the defendant's] procedures were 'reasonably adapted' to avoid the misidentification of the original creditor … is an issue for the jury." (citing *Engelen v. Erin Cap. Mgmt., LLC*, 544 F. App'x 707, 709 (9th Cir. 2013))); *Anderson v. Ocwen Loan Servicing, LLC*, No. 2:15-cv-05124-SVW-AGR, 2017 WL 11635394, at *3 (C.D. Cal. Oct. 24, 2017) ("Ocwen may well have committed error in sending incorrect notices to Plaintiff. However, there is evidence that it has procedures in place to prevent these errors. Whether such procedures are sufficient to avoid liability is a question for the jury." (citing *Holsinger v. Wolpoff & Abramson, LLP*, 2006 WL 2092632, at *15 (N.D. Cal. July 27, 2006))); *Keil v. Equifax Info. Servs.*, No. 13-03989 SI, 2014 WL 4477610, at *2 (N.D. Cal. Sept. 10, 2014) (concluding that a genuine dispute of material fact existed as to the plaintiff's claim against the defendant for violating the CCRAA in part because "[w]hether [the defendant's] procedures were reasonable is a question of fact, not suitable for disposition at the summary judgment stage"). Nevertheless, "summary judgment is not precluded altogether on questions of reasonableness. It is appropriate 'when only one conclusion about the conduct's reasonableness is possible.'" *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1157 (9th Cir. 2009) (quoting *In re Software Toolworks Inc.*, 50 F.3d 615, 622 (9th Cir. 1994)).

Defendant contends that Plaintiff's information was inaccurately reported to the CRAs because Defendant's employee, Cook, mistakenly selected the incorrect work action in Defendant's software application when inputting the information regarding Mir Alikhan's settlement of the Account. Sapp's declaration states that the correct work action for Cook to select would have been "Close Debtor" for the two remaining responsible parties—Mir Alikhan and Afreen Alikhan. (ECF No. 19-1 at 31.) Instead, Cook selected

---

[16] FDCPA cases applying the bona fide error defense are instructive because, as the California Court of Appeals has noted, "both the FDCPA and CCRAA preclude liability due to a defendant's 'bona fide error' if the defendant maintained reasonable procedures designed to avoid alleged errors." *Antich v. Cap. Accts., LLC*, B313167, 2023 WL 4758493, at *4 (Cal. Ct. App. July 26, 2023) (citing 15 U.S.C. § 1692k(c); Cal. Civ. Code § 1785.25(g)).

the "Close ACCOUNT" work action, which caused Defendant to furnish information to the CRAs indicating that the Account was "paid in full for less than the full balance" "for all three debtors, as opposed to the two remaining responsible parties." *Id.* at 31–32. Sapp's declaration states that Cook "made an unintentional error by selecting 'Close Account' instead of 'Close Debtor.'" *Id.* at 31. Sapp's declaration states:

> Mr. Cook either had the equivalent of a key stroke error by inadvertently clicking the wrong function on the work action, or he failed to follow his training to review the Account for the number of consumers associated with the Account and confirm whether any alleged debtor had been previously recalled—which is evident from the Account Notes for Plaintiff—whereby Mr. Cook would have used the "Closed Debtor" work action for two of the alleged debtors, rather than the Close Account work action that affects all potential debtors associated with the Account.

*Id.* Sapp states that "[t]here was no reason for this to be done, other than a human error." *Id.* at 32.

Beyond his evidentiary objections to Sapp's testimony that the Court has rejected, Plaintiff does not dispute Defendant's contention that Cook's selection of the incorrect work action was a genuine mistake. Instead, the only element of the bona fide error defense that is in dispute is whether Defendant "maintained reasonable procedures to comply with [the CCRAA]." Cal. Civ. Code § 1785.25(g).

### 1.    Defendant's Evidence of Its Procedures

Defendant submits Sapp's declaration as evidence describing its pertinent procedures. Specifically, Sapp's declaration provides the following description of Defendant's software application, WinDebt:

> For more than 25 years, [Defendant] has utilized a collection software application, WinDebt, to maintain its collection accounts. WinDebt provides the ability to program multi-level drop down menus that serve as a flow chart to ensure account and credit reporting accuracy. For example, the work actions are programmed to make it easy for the user to accurately reflect items such as changes in the amount of the debt, payments and settlements, changes in account information, communications with the original creditor to verify debts and assist in dispute investigations, notate and submit the results of

> dispute investigations to the CRAs, mark accounts as disputed by the consumer, and close accounts by debtor or account. Each of these functions on the drop-down menus are "work actions" and the series of work actions are "work flows" similar to a flow chart. The use of WinDebt and the work actions that [Defendant] programs into the application are designed to ensure compliance with [Defendant's] policies and procedures as well as relevant state and federal consumer protection laws.

(ECF No. 19-1 at 24.)

Sapp's declaration also states that "the work actions and work flows created within WinDebt ensure that changes in the account information is accurately reflected in data furnished to the CRAs using the Metro 2 format and codes, the standard electronic data reporting format used by the CRAs and data furnishers such as [Defendant]." *Id.* "[T]he selections made using [WinDebt's] work actions automatically change the information furnished to the CRAs including account information, Compliance Condition codes (method for noting accounts for consumer disputes), the Account Status Codes (such as collection account or paid account) and Special Comment codes." *Id.* at 24–25.

Sapp's declaration provides additional information about the formatting of the menu system in WinDebt:

> The multi-level nature of the drop down menus prompt employees to select the appropriate work action to ensure that the appropriate tasks are undertaken and completed. Once a work action is selected, WinDebt automatically ensures that all necessary changes for the account occur in the system associated with that work action. This removes the possibility that an employee will forget to conduct all necessary changes and minimizes errors.

*Id.* at 25.

Sapp's declaration also describes how Defendant selects which employees have access to perform "closing work actions":

> While all employees in the collection process are trained how to use the work actions in WinDebt, to ensure compliance with the closing procedures and to ensure accuracy in Account Status code changes, [Defendant] does not allow collectors to complete the account closing work actions. Only certain employees - managers, client services, and dispute investigators with more

32

> experience and training have access to perform these closing work actions. All of these employees with access to change the Account Status code have been trained by [Sapp], the VP of Operations, and [Sapp's] highest level managers.

*Id.*

Sapp's declaration states that, based upon his department's performance of "account audits" and "review [of] issues revealed in lawsuits and consumer complaints," Defendant "refines [its] policies and procedures, as well as WinDebt functions and work actions, to address any issues where the policies need to be changed to prevent errors or perform follow-up training if procedures are not being followed." *Id.* at 26. "[Defendant] also conducts monthly training meetings with the managers and performs continual training and reminders on WinDebt work action issues, particularly if a consumer complaint reveals an issue that needs attention." *Id.* Finally, Sapp states that, during his 30-year career with Defendant, he "is unaware of a similar mistake leading to a complaint or lawsuit" as the mistake that occurred in this case, with Cook selecting the wrong work action that led to inaccurate information about Plaintiff being reported to the CRAs. *Id.* at 32.

In sum, Defendant contends that its policies and procedures are "designed to minimize human and computer error and ensure accurate accounts before they are reported." (ECF No. 27 at 7.) These policies include:

> (1) using software that automatically updates the account data-file to the CRAs to eliminate manual upload errors; (2) "work actions" programmed into WinDebt to make it easy for the user to accurately reflect items such as closing accounts by debtor or account; (3) multi-level drop-down menus prompting employees to select the appropriate action to ensure the correct tasks are taken; (4) WinDebt automatically ensures that all necessary changes for the account occur in the system for the work actions selected to remove the possibility that an employee will forget to conduct all necessary changes for accurate reporting; (5) only managers, client services, and dispute investigators with more experience and training have access to perform these closing work actions; and (6) the training of those high level employees performing the closing actions by Ron Sapp, the VP of Operations, and his highest level managers.

*Id.* at 7–8 (internal citations omitted). Defendant contends that Plaintiff offers no evidence to dispute the reasonableness of these procedures. *Id.* at 8.

### 2.    Whether Defendant's Procedures Are Reasonably Adapted to Prevent the Error at Issue

Plaintiff contends that "[Defendant's] liability under the CCCRAA does not hinge on how the initial inaccuracy occurred but rather on its repeated submission of information it knew or should have known was false." (ECF No. 22 at 23.) Plaintiff contends that Defendant's procedures were unreasonable because "[Defendant] has produced no evidence—no named procedure or documented quality control process—to support its claim that it conducts meaningful accuracy checks before submitting data to the credit bureaus." *Id.* Plaintiff points out that Sapp testified that, while he reviews Defendant's account files after they are reported to the CRAs "to ensure that they have been submitted correctly," there are "hundreds of thousands of files to review" and he "honestly can't review each and every file." (ECF No. 22-10 at 23–25.) Plaintiff contends that "[t]o [Sapp], ensuring accuracy does not mean verifying that the reported information is correct—it simply means confirming that the accounts are being reported at all, regardless of their accuracy." (ECF No. 22 at 23.)

Defendant contends that Plaintiff's recognition that it would be a "nearly insurmountable" task to require Sapp to review each weekly report of hundreds of thousands of account files demonstrates that it would be unreasonable to expect Defendant to implement such review. (ECF No. 27 at 9.) Defendant contends that "Plaintiff ignores the fact that [Defendant's] account system ensures that the accounts report the information without deviation or error." *Id.*

Essentially, the parties dispute whether the reasonableness of Defendant's procedures should be assessed based upon (1) Defendant's procedures to prevent errors when inputting account information and selecting work actions or (2) Defendant's procedures (or lack thereof) for reviewing the inputted information or otherwise ensuring that the information reported to the CRAs is correct. The Court finds that, viewing the

evidence in the light most favorable to Plaintiff and drawing all justifiable inferences in his favor, a genuine dispute of material fact exists as to the reasonableness of Defendant's procedures. While a reasonable jury could find that the procedures described in Sapp's declaration are reasonably adapted to prevent errors such as the error that occurred in this case—Cook's selection of the incorrect work action for the Account—a reasonable jury could also find that Defendant's failure to implement any procedures to double-check the inputted information to ensure that the appropriate work actions were selected demonstrates a lack of procedures reasonably adapted to prevent the error at issue.

For instance, in *Engelen v. Erin Cap. Mgmt., LLC*, 544 F. App'x at 708–09, the Ninth Circuit reversed the district court's grant of summary judgment in favor of the debt collector on the bona fide error defense under the FDCPA. The error arose when the defendant garnished the plaintiff's wages—despite the plaintiff's satisfaction of his debt—due to the defendant's bookkeeper's "fail[ure] to record [the plaintiff's payment]." *Id.* at 708. The Ninth Circuit held that, viewing the evidence in the light most favorable to the plaintiff, the defendant's procedures, "which consisted of legal compliance training, a written policy describing how payment notifications were to be handled, and periodic spot-checking of the bookkeeper's work, were not, as a matter of law, 'reasonable preventive procedures aimed at avoiding the errors.'" *Id.* at 708–09. The Ninth Circuit reached this conclusion because "[b]esides the periodic spot-checking, none of [the defendant's] procedures were aimed at preventing wrongful wage garnishments caused by the bookkeeper's failure to record payment information. And even the periodic spot-checking did not consistently reduce the likelihood of recording errors." *Id.* at 709. In particular, the Ninth Circuit pointed out that the defendant had "presented no evidence of any regular redundancies designed to catch human recording errors." *Id.*

In this case, Defendant likewise offers no evidence of any procedures it has implemented "to catch human recording errors" in inputting account information and selecting the appropriate work actions. *Id.* Indeed, Defendant does not provide any evidence of procedures akin to the "spot-checking" that the Ninth Circuit held was still

insufficient in *Engelen* to entitle the defendant to summary judgment on the bona fide error defense. Instead, Defendant's evidence of procedures and work actions is exclusively related to the initial entry of the information. While Sapp reviews Defendant's accounts when they are submitted to the CRAs, he confirmed that he is "ensuring accuracy, as far as transmission of the file," which is "not a review to determine if the information included in each account is accurate." (ECF No. 27 at 15–16.) Although Defendant contends that "it is more efficient and more prudent to prevent errors than to try to find them afterward" and "[a]n ounce of prevention is worth a pound of cure," *id.* at 8, the Court must leave such conclusions regarding the reasonableness of Defendant's procedures to the jury.[17]

In conclusion, because, construing the evidence in the light most favorable to Plaintiff, a reasonable jury could conclude that Defendant has not implemented procedures reasonably adapted to prevent the error at issue, a genuine dispute of material fact remains as to the reasonableness of Defendant's procedures. Defendant is not entitled to summary judgment on its bona fide error defense.[18]

---

[17] Plaintiff also appears to contend that Defendant may not introduce evidence of its unwritten procedures via Sapp's declaration or deposition testimony. Specifically, Plaintiff contends that, "[g]iven [Defendant's] refusal to provide the procedures in response to [Plaintiff's] direct [discovery] requests, the only reasonable inference is that no such procedures exist." (ECF No. 22 at 19.) However, Plaintiff cites no authority for the proposition that a furnisher's procedures must be written or that a furnisher cannot provide evidence of unwritten procedures through a corporate representative's declaration or testimony. Indeed, some courts have accepted unwritten procedures as satisfying the bona fide error defense. *See, e.g.*, *Koch v. 704 Grp., LLC*, No. 13-cv-2569-BAS(WVG), 2014 WL 7330877, at *6 (S.D. Cal. Dec. 18, 2014) (reasoning, in the context of an FDCPA claim, that "[t]hough the policy is *unwritten* and simple, this is a reasonable procedure to avoid filing a time-barred lawsuit. It is undisputed that Mr. Brkich has never filed a claim past the statute of limitations, so this policy appears to be generally sufficient to avoid this type of error." (emphasis added)). Thus, absent authority indicating otherwise, the Court is unwilling to find that Defendant's failure to memorialize its procedures in writing renders the procedures inadequate to support the bona fide error defense. While the lack of written procedures may be a relevant consideration for the jury when deciding whether Defendant's procedures were "reasonable," the Court declines to find that the lack of written documentation conclusively establishes that Defendant's procedures are unreasonable.

[18] At oral argument, counsel for Defendant questioned whether Plaintiff could establish the final element of his CCRAA claim—that Defendant "[knew] or should have know[n]" that the information it reported about Plaintiff was "incomplete or inaccurate." Cal. Civ. Code § 1785.25(a). Specifically, counsel for

**E.    Willfulness**

Defendant also contends that Plaintiff cannot demonstrate that its conduct was willful. Whereas a plaintiff who proves a negligent violation of the CCRAA can recover only his actual damages, a plaintiff who can demonstrate that the defendant's violation was "willful" can also recover punitive damages. Specifically, the CCRAA provides:

(a) Any consumer who suffers damages as a result of a violation of this title by any person may bring an action in a court of appropriate jurisdiction against that person to recover the following:

> (1) In the case of a negligent violation, actual damages, including court costs, loss of wages, attorney's fees and, when applicable, pain and suffering.

> (2) In the case of a willful violation:

>> (A) Actual damages as set forth in paragraph (1) above[;]

>> (B) Punitive damages of not less than one hundred dollars ($100) nor more than five thousand dollars ($5,000) for each violation as the court deems proper;

>> (C) Any other relief that the court deems proper.

Cal. Civ. Code § 1785.31(a)(1)–(2). "Under California law, 'three essential elements must be present to raise a negligent act to the level of willful misconduct: (1) actual or constructive knowledge of the peril to be apprehended, (2) actual or constructive knowledge that injury is a probable, as opposed to a possible, result of the danger, and (3) conscious failure to act to avoid the peril.'" *Garcia v. Navy Fed. Credit Union*, No. 23-cv-2017-MMA-BLM, 2025 WL 1100898, at *15 (S.D. Cal. Apr. 14, 2025) (quoting

---

Defendant contended that Defendant could not have known about Cook's error before Plaintiff brought the error to Defendant's attention. Notably, this argument was not raised in the briefing on the pending motion. In any event, the Court concludes that a reasonable jury could find that, when Defendant reported Plaintiff as a debtor on the Account in April 2022, Defendant "should have know[n]" that this reporting was "inaccurate" because Defendant had previously received confirmation from Sugarloaf Apartments in January 2022 that Plaintiff had executed the Roommate Release and was not liable for the debt.

*Manuel v. Pac. Gas & Elec. Co.*, 93 Cal. Rptr. 3d 9, 21–22 (Ct. App. 2009); *Grigoryan*, 84 F. Supp. 3d at 1091).

Essentially, a willful violation is an act "done knowingly or recklessly in disregard of the FCRA's[19] requirements." *Messano v. Experian Info. Sols., Inc.*, 251 F. Supp. 3d 1309, 1315 (N.D. Cal. 2017) (citing *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 (2007)). With regard to recklessness, "a company subject to [the] FCRA does not act in reckless disregard of it unless the action is not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Safeco Ins. Co. of Am.*, 551 U.S. at 69. Applying this rule, the Supreme Court held that defendants did not "willfully" violate the FCRA where their "reading of the statute, albeit erroneous, was not objectively unreasonable," and so their actions fell "well short of raising the 'unjustifiably high risk' of violating the statute necessary for reckless liability." *Id.* at 69–70. In other words, in order for the plaintiff to demonstrate willfulness, "the defendant must have taken action involving 'an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" *Palasi v. IQ Data Int'l, Inc.*, No. 22-cv-01888-AJB-MMP, 2024 WL 171384, at *10 (S.D. Cal. Jan. 16, 2024) (quoting *Taylor v. First Advantage Background Servs. Corp.*, 207 F. Supp. 3d 1095, 1102 (N.D. Cal. 2016)). "[W]illfulness under the FCRA is generally a question of fact for the jury." *Martinez v. Am. Express Nat'l Bank*, No. 21-8130-DMG (MAAx), 2022 WL 16571194, at *5 (C.D. Cal. Nov. 1, 2022) (quoting *Edwards v. Toys "R" Us*, 527 F. Supp. 2d 1197, 1210 (C.D. Cal. 2007)).

Defendant contends that it is entitled to summary judgment on the issue of willfulness because the inaccurate reporting of the Account "was the result of a human

---

[19] As noted above, "judicial interpretation of the [FCRA] is persuasive authority and entitled to substantial weight when interpreting the [CCRAA].'" *Carvalho*, 629 F.3d at 889 (quoting *Olson*, 111 Cal. App. 4th at 12); *see also Garcia*, 2025 WL 1100898, at *15 (observing that courts comparing the "willfulness" standards under the FCRA and CCRAA "have found these standards effectively the same" (citing *Grigoryan*, 84 F. Supp. 3d at 1091; *Banga v. First USA, NA*, 29 F. Supp. 3d 1270, 1279 (N.D. Cal. 2014))).

error in a post-collection activity to close the account which cannot be described as an act done knowingly or recklessly in disregard of the CCRAA's requirements for accurate reporting, particularly when [Defendant] rectified the mistake immediately upon receipt of Plaintiff's dispute." (ECF No. 19 at 3.) Defendant contends that Cook's mistake of selecting the incorrect work action was not done knowingly or recklessly, but rather was "an inadvertent error, despite [Defendant's] careful efforts to avoid such violations" through its work actions, which are "only input by employees trained by [Defendant's] VP of Operations." *Id.* at 13. Defendant also relies upon Sapp's statement in his declaration that, during his thirty years "overseeing [Defendant's] litigation," he is "unaware of a similar mistake leading to a consumer complaint or lawsuit." (ECF No. 19-1 at 32; *see also* ECF No. 27 at 10.)

Plaintiff's contentions regarding willfulness essentially mirror his contentions about the unreasonableness of Defendant's procedures. Specifically, Plaintiff contends that "[Defendant] has failed to produce any procedure that would have prevented it from submitting inaccurate information to the credit bureaus." (ECF No. 22 at 25.) Plaintiff contends that, instead, Defendant "relies on a fundamentally flawed system in which a single employee, Sapp, is tasked with reviewing hundreds of thousands of credit submissions each week—an insurmountable task that makes any meaningful review impossible." *Id.* Plaintiff contends that this "deficient process" resulted in "consecutive weeks of inaccurate credit reporting,"[20] which "reflects a complete disregard for statutory obligations and consumer rights." *Id.* Plaintiff contends that, "[g]iven the absence of written procedures and the staggering frequency of violations, a jury could reasonably

---

[20] Plaintiff specifically contends that Defendant reported the inaccurate information for "88 consecutive weeks." *Id.* However, as discussed above, Plaintiff fails to provide evidence that creates a genuine dispute of material fact as to whether Defendant reported the information on dates other than the dates specified in Defendant's Account Notes. *See supra* at 12 n.4. The Account Notes reflect that Defendant reported Plaintiff's information to the CRAs on ten separate dates. (*See* ECF No. 19-1 at 41–42.)

conclude that [Defendant's] actions constitute a willful violation of the CCCRAA." *Id.* Plaintiff also contends that willfulness is generally a fact issue to be decided by the jury.

Here, Plaintiff fails to raise a triable issue of material fact as to Defendant's willfulness, as there is no evidence that Defendant had "actual or constructive knowledge that injury"—in the form of furnishing inaccurate information to the CRAs—was "a probable, as opposed to a possible, result of" its procedures. *Garcia*, 2025 WL 1100898, at *15. For example, Plaintiff does not provide evidence of any prior occasions where Defendant has committed the same or similar types of errors due to selecting the wrong work actions. Such evidence would have indicated that Defendant should have been on notice that its procedures were so unreasonable as to pose an "unjustifiably high risk" of violating the CCRAA. *See Safeco Ins. Co. of Am.*, 551 U.S. at 69–70; *cf. Lopez v. Experian Info. Sols., Inc.*, No. 19-cv-01954-RS, 2022 WL 1569285, at *7 (N.D. Cal. May 18, 2022) (finding that a triable issue of fact existed as to whether Experian was "acting in reckless disregard of its statutory duties" in violation of the FCRA in part because "Experian had been alerted to information that would cast doubt on the accuracy of its procedures"). In fact, Sapp's declaration indicates that Defendant was not aware of the potential risk of inaccuracies posed by its procedures, as Sapp states that, to his knowledge, a "similar mistake leading to a consumer complaint or lawsuit" has not occurred in the past thirty years he has worked for Defendant. (ECF No. 19-1 at 32.) Based upon this evidence, while a genuine dispute of material fact exists as to whether Defendant's procedures were reasonable, a reasonable jury could not find that Defendant's procedures were so unreasonable that Defendant took "an action involving 'an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" *Palasi*, 2024 WL 171384, at *10.

In short, Plaintiff merely contends "without supporting authority, that [Defendant's] procedures were reckless. That is not enough to defeat summary judgment." *Doherty*, 2025 WL 1090401, at *9. In *Doherty*, although the court found that triable issues of material fact existed as to whether the defendant's procedures were unreasonable under the FCRA and

CCRAA, the court found that the defendant had shown that there was no genuine dispute of material fact as to whether it had committed a willful violation of the FCRA. *Id.* at *8. The court explained that, "[a]lthough a jury could find that [the defendant] acted negligently, based on the evidence presented in opposition to the Motion, a jury could not reasonably find that [defendant] knowingly, intentionally, or recklessly violated the statute" because "[the plaintiff] [did] not provide any evidence that [the defendant's] actions ran a 'risk of violating the law substantially greater than the risk associated with a reading that was merely careless.'" *Id.* at *9 (quoting *Safeco Ins. Co. of Am.*, 551 U.S. at 69). The same is true in this case. Plaintiff provides no authority demonstrating that Defendant's procedures constituted "recklessness" that could support a finding of a willful violation of the CCRAA.

The Court accordingly concludes that no reasonable jury could find that Defendant's violations of the CCRAA were willful. Because Plaintiff has failed to raise a genuine dispute of material fact as to Defendant's willfulness, Defendant's Motion for Summary Judgment is granted with respect to Plaintiff's request for punitive damages. Plaintiff thus may not seek punitive damages for Defendant's violations of the CCRAA. Instead, Plaintiff's recovery, if any, will be limited to his actual damages incurred as a result of Defendant's violations of the CCRAA. *See* Cal. Civ. Code § 1785.31(a)(1).

## V.    CONCLUSION

IT IS HEREBY ORDERED that the Court's Order to Show Cause (ECF No. 28) is discharged. The Court is satisfied that it may properly exercise diversity jurisdiction over Plaintiff's remaining CCRAA state-law claim.

IT IS FURTHER ORDERED that Defendant's Motion for Summary Judgment (ECF No. 19) is granted in part and denied in part, as follows:

Defendant's Motion is GRANTED as to Plaintiff's FDCPA claim.

Defendant's Motion is also GRANTED with respect to Plaintiff's request for punitive damages, as Plaintiff has failed to raise a genuine dispute of material fact as to whether Defendant willfully violated the CCRAA.

Defendant's Motion is DENIED with respect to its request for summary judgment on its bona fide error affirmative defense.

Defendant's Motion is DENIED with respect to its request that the Court dismiss this action for lack of Article III standing.

Defendant's Motion is DENIED with respect to its request that the Court find Plaintiff has failed to raise a genuine dispute of material fact as to his economic damages.

IT IS FURTHER ORDERED that, within ten (10) days of the entry of this Order, the parties must jointly contact Magistrate Judge Crawford to coordinate rescheduling the deadlines in this case that the Court previously vacated pending the disposition of the Motion for Summary Judgment. (*See* ECF No. 34.)

Dated:  July 17, 2025

Hon. William Q. Hayes
United States District Court